FILED & ENTERED

SEP 09 2015

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | CHAPTER 7 |
| James Donzil Roberts, Sr<br>Deena Waldman Roberts | Case No.:  1:12-bk-16474-MT |
| | Adv No:   1:12-ap-01371-MT |
| Debtor(s). | |
| Michael Barnes,  California Farms<br>Investors LLC | **MEMORANDUM OF DECISION<br>FOLLOWING TRIAL** |
| Plaintiff(s). | |
| v. | |
| James Donzil Roberts Sr, Deena<br>Waldman Roberts | Dates:       February 2-4 and 9, 2015<br>Time:        9:00 a.m.<br>Courtroom:  302 |
| Defendant(s). | |

     Michael Barnes ("Barnes") and California Farm Investors LLC ("CA Farm Investors," collectively, the "Plaintiffs") are seeking to except from discharge a principal amount of $825,000 plus interest, attorneys' fees, and punitive damages, under 11 U.S.C. §§  523(a)(2)(A), (a)(4) and (a)(6) against James Roberts, Sr. ("Defendant") and Deena Roberts[1] (collectively, "Debtors"). The matter has been tried and submitted for decision.[2] As discussed below, the Court finds that the debt is not dischargeable solely under 11 U.S.C. § 523(a)(2)(A) as to Debtor James Roberts, Sr.

---

[1] Deena Roberts was dismissed as a Defendant by stipulation at the outset of trial.
[2]  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## I.    PROCEDURAL HISTORY

On July 18, 2012, Debtors filed a voluntary petition for relief under chapter 7 of the bankruptcy code. See Case No. 12-16474-MT. The first meeting of creditors was scheduled and conducted on August 17, 2012.

Plaintiffs timely filed an adversary complaint (the "Complaint") on October 15, 2012. See Adversary Case No. 12-01371-MT. The Complaint lacked the holographic signature and/or was not accompanied by the required Local Bankruptcy form Electronic Filing Declaration. The Plaintiffs filed an amended complaint correcting this deficiency on October 22, 2012. See Adv. ECF no. 4. On February 12, 2013, Plaintiffs served the Complaint on Debtors. Plaintiffs originally alleged fourteen causes of action in the amended complaint but pursued only three causes of actions under §§ 523(a)(2)(A), (a)(4) and (a)(6) at trial; all others causes of action in the complaint were abandoned and dismissed with prejudice.

The parties filed a written stipulation as to some of the facts of this case. See Adv. ECF No. 46. The Court hereby adopts the stipulated facts as findings of fact of this Court and discusses them along with any other trial evidence as part of the findings of fact and conclusions of law.

## II.    FINDINGS OF FACT [3]

Plaintiffs are investors in, and secured creditors of, California Farms, Inc. ("CFI")[4] and California Organics LLC[5], which are affiliates of Defendant James Roberts (hereafter "Roberts"). Barnes is an admittedly sophisticated investor with an extensive background in lending and investing. Defendant at all pertinent times was a controlling shareholder as well as the Chief Executive Officer of CFI, and a controlling party and executive officer of both California Organics LLC and CFI.

Roberts and Daniel Fantz ("Fantz") formed CFI in late 2008. Roberts is a lawyer admitted to the California Bar in 1985. Fantz was an entertainment executive and produced movies and television shows. Roberts and Fantz met while working at Clearvision Entertainment. Roberts and Fantz developed the idea of selling gourmet organic salads to retail grocery stores.

In approximately April 2009, Roberts, Fantz, and Santos Martinez ("Martinez") became partners with each other in a joint venture. Martinez did business through his company Manjar Inc. ("Manjar"). Roberts, Fantz, and Martinez entered into a written Joint Venture Agreement and formed such venture through their wholly owned companies CFI and Manjar ("the Venture"). As of September 7, 2009, Roberts and his venture partners had formed "California

---

[3] The findings of fact and conclusions of law herein constitute the Court's findings under *Federal Rule of Civil Procedure 52(a)*, applicable in this bankruptcy proceeding under *Federal Rule of Bankruptcy Procedure 9014*. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the conclusions of law constitute findings of fact, they are adopted as such. The findings of fact and conclusions of law herein may be considered by the District Court under § 157(c)(1).
[4] CFI is a suspended California corporation with registered offices at 4976 Corral Street, Simi Valley, CA 93063.
[5] Organics LLC is a California limited liability company with registered offices at 1421 Valverde Place, Glendale, CA 91208.

Farms II, LLC," of which CFI and Manjar were the members. In November 2009, California Farms II LLC was renamed California Organics, LLC ("Organics LLC"). Roberts and Fantz were in charge of promoting the Venture. Fantz and Martinez had the farming experience.

In 2009, prior to Plaintiff's' investment, Roberts, Fantz and Martinez engaged Geoffrey Mousseau ("Mousseau") as Executive Manager to run the day to day operations of Organics LLC. Mousseau is a disbarred California attorney criminally convicted for mail, wire, and bankruptcy fraud, money laundering, and conspiracy to commit fraud and money laundering. Roberts knew that Mousseau, the Executive Manager of Organics LLC, was a convicted felon and disbarred attorney. Roberts, who is a licensed California attorney, knew that disclosure of the felony record and incarceration of Mousseau was and is a required disclosure to prospective investors. Barnes testified, however, that it was not until approximately late May of 2010, after investing in the Venture, that that he learned about Mousseau's felony through Martinez.

Roberts met Plaintiffs in October 2009, for the purpose of seeking funding for Defendants' Joint Venture. Frantz and Roberts were the initial contacts with Barnes. Roberts and Fantz created the materials employed to solicit Plaintiffs' investments. Fantz wrote a colorful offering brochure, reviewed and used by Roberts to solicit investments in Organics LLC. Roberts and Fantz brought the brochure with product mock ups with them to their initial meeting with Barnes and they conducted the investment presentation together.

In order to seek investment from Plaintiffs, Roberts presented the following to Plaintiffs:

    A.  a business plan providing "projections" which Defendant did not verify;
    B.  misleading "use of proceeds" projections;
    C.  false assurances regarding the status of accounts receivable;
    D.  false assurances about guaranteed purchase contracts which in fact did not exist.

Roberts represented to Barnes that CFI was an ongoing farming concern and the Venture was presently growing and delivering organic produce to wholesalers, poised to ship orders for own-grown organic produce directly to top retailers. Roberts represented that the venture had an agreement with Stater Bros. and Albertsons. Roberts said the Venture needed only a shortswing bridge financing pending highly anticipated and impressive profits.

In reality, however, as discussed below, Roberts was reckless with his representations of the Venture. Although, Roberts had lots of high hopes, he was heedless about the accuracy of the information he gave people to make it all happen. Roberts thought they could keep the venture running with a line of credit until the company pulled it together, but that was never guaranteed. Roberts and his witnesses disclaimed knowledge of who concocted the three pages of financial projections in the October 18, 2009 email. See Tr. Ex.  72- 6-8. These financials presented by Roberts did not include management fees or the costs for purchased produce. Id.

The Principals' had no "farming" background. Martinez was the one who had the certified organic grower license and the farm acreage. Martinez through Manjar was responsible for delivering the Venture's produce. Roberts did far too little to understand the new Manjar operation before soliciting investments with representations that he was promoting a going concern poised to earn stupendous profits. Martinez had recently re-acquired his farming assets after a "bad business deal."  See Tr. Ex. B (11/8/08 email from Martinez accountant forwarding

Manjar financials). When Roberts saw Martinez's facility, Roberts observed that Martinez's claimed assets "were not presently in use by Manjar for any such [farming] business." See Tr. Ex. 146 at ¶ 7. Roberts also failed to show meaningful diligence concerning the ability of Manjar's operation to deliver grown lettuce when hoped-for orders from retailers materialized. Roberts' failure to learn even minimal information about the status of Manjar's operations was underscored by the testimony of Fantz that Martinez did not have seeds in the ground such that orders from retailers could have been fulfilled through Manjar's-grown lettuce.  In addition, Barnes testified that Roberts and Fantz nowhere disclosed in the offering materials that they had an undefined arrangement to absorb some or all of the costs of Manjar's operations in consideration of delivery of Manjar-grown lettuce to retailers sourced by Roberts and Fantz.

Because the Venture did not have sufficient capability to grow and sell its own produce, beginning as early as March 2010, Organics LLC began incurring massive debt purchasing produce from third parties, all protected by the Perishable Agricultural Commodities Act, 7 U.S.C. § 499(c)(5) ("PACA"), pursuant to which certain insiders of companies incurring trade debt to protected growers can be held personally liable for such debts. Without Plaintiffs' knowledge or consent, Barnes was exposed to personal liability for such debts. On September 13, 2010, the first action by PACA against Plaintiffs was filed, suits in which Barnes was personally named. Ultimately, Barnes was forced to assign the collateral securing repayment of their investment to the PACA creditors in order to settle his liability under the PACA lawsuits. See Tr. Ex. 151.

Prior to Barnes assigning the Venture's collateral to the PACA creditors, in June of 2010, he exercised his emergency management power under the operating agreement and took over the entire company, seizing all of the equipment. The Venture eventually failed due to underfunding; the seizure of equipment and halt of production; and Martinez's alleged sabotage. In the end, Roberts misled everyone into thinking there would be a big payoff but his lack of even basic due diligence along with the Company's internal disputes caused it to crater.

Roberts fraudulently induced Plaintiffs' investments through misrepresentations, false pretenses and concealments. Roberts, along with his Joint Venture partners Fantz and Martinez, made numerous false and misleading representations to Plaintiffs, to induce Plaintiffs – mostly CA Farm Investors but also Barnes personally – to make investments eventually totaling $825,000 cash to Organics LLC and CFI. Of this amount, $822,000 is reflected by secured notes, and $3,000 was paid to purchase equity in Organics, LLC. Additionally, Barnes covered certain bank account deficits for Organics, LLC. These investments were delivered in tranches, from November 6, 2009 through April 21, 2010 in three stages. Initially, Plaintiff CA Farm Investors agreed to invest $574,000 through a secured note dated November 5, 2009 (the "First Note"). See Tr. Ex.  124. In early February 2010, Roberts sought additional funding of $150,000 from CA Farm Investors. The parties executed an Amended and Restated Secured Note for $723,000 (the "Second Note"), See Tr. Ex.  125. In March and April of 2010, Roberts solicited an additional $100,000 from Barnes. Also, each note was secured by a pledge of collateral, including the equipment contributed by Manjar to Organics LLC. See Tr Ex. 126, 127, and 129.

During the trial, there was substantial direct and cross examination of all witnesses. Barnes' testimony was detailed, consistent, and credible.  Roberts, on the other hand, appeared to be evasive and cautious with his language.

### III.    CONCLUSIONS OF LAW

Plaintiffs bear the burden of proving facts by a preponderance of the evidence to demonstrate that, under 11 U.S.C. §§ 523(a)(2); (a)(4) and (a)(6), Defendant is not entitled to a discharge of the debts owing to Plaintiffs.  See Grogan v. Garner, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).  When a party has the burden of proof on any claim by a preponderance of the evidence, it means the judge must be persuaded by the evidence that the claim is more probably true than not true.

### A.    § 523(a)(2)(A) – Fraud in the Inducement

Section 523(a)(2)(A) excepts from discharge any debt "to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §523(a)(2)(A).  A creditor's claim of nondischargeability based on section 523(a)(2)(A) must satisfy five elements: (1) the debtor made a false statement or engaged in deceptive conduct; (2) the debtor knew the representation to be false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained damage resulting from its reliance on the debtor's representation.  In re Slyman, 234 F.3d 1081, 1085 (9th Cir. 2000).  The Ninth Circuit requires that the provisions of § 523(a) exceptions to discharge should be construed narrowly. See, e.g., Cal. Franchise Tax Bd. v. Jackson (In re Jackson), 184 F.3d 1046, 1051 (9th Cir.1999); Bowen v. Francks (In re Bowen), 102 B.R. 752, 756 (B.A.P. 9th Cir. 2001).

A scheme to defraud under 523(a)(2)(A) includes the failure to disclose material facts that the debtor has a duty to disclose. In re Tallant, 218 B.R. 58 (9th Cir. B.A.P. 1998) (debtor-attorney's debt to client for failure to disclose material information, including the adverse nature of their relationship, nondischargeable under § 523(a)(2)(A)). It is of no consequence that a debtor's fraud was committed on behalf of an enterprise, and that his benefit from the fraud may have been indirect. An individual debtor may be held liable under Section 523(a)(2)(A) where he acts in concert with others in a scheme committed in furtherance of an enterprise. In re Arm, 175 B.R. 349, 352-3 (9th Cir. B.A.P.1994), aff'd, 87 F.3d 1046 (9th Cir. 1996). Under the "indirect benefit" doctrine, the debtor could be held liable for carrying out the fraudulent scheme with others through an entity. Id.

The Court must first determine whether Defendant knew the statements or deceptive conduct were false when he made them, or alternatively, he made them with reckless disregard for the truth of the statements.  See Gertsch v. Johnson & Johnson, Fin Corp. (In re Gertsch), 237 B.R. 160, 167 (9th Cir. B.A.P. 1999), citing In re Houtman, 568 F.2d 651, 656 (9th Cir. 1978). A representation may be fraudulent, without knowledge of its falsity, if the person making it "is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented."  Id. at 168. "[O]pinions as to future events which the declarant does not, in fact, hold or declarations made with reckless indifference for the truth may be found to be fraudulent." In re Rubin, 875 F.2d 755, 759 (9th Cir. 1989). "Bankruptcy courts have overwhelmingly held that a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A)." In re Bocchino, No. 14-4299, 2015 WL 4478124, at *5 (3d Cir. July 23, 2015) citing In re Docteroff, 133 F.3d 210, 216 (3d Cir. 1997) (quoting In re Van Horne, 823 F.2d 1285, 1288 (8th Cir.1987).

Because it is nearly impossible to prove intent to deceive by direct evidence, "[a] court may infer fraudulent intent from various kinds of circumstantial evidence." Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir.1987); In re Gertsch, 237 B.R. 160, 167–68 (B.A.P. 9th Cir.1999). The court may look at "the totality of the circumstances and the conduct of the person accused" in order to make an inference of fraudulent intent. In re Ormsby, 591 F.3d 119, 1206 (9th Cir.2010). When the misrepresentation is a promise to perform in the future, the subsequent failure to perform is not enough to prove the promise was fraudulent; rather it must be shown that the debtor did not intend to perform at the time the promise was made. In re Lee, 186 B.R. 695, 699 (9th Cir. BAP 1995).

For determining reliance, courts apply a subjective "justifiable" reliance standard, which turns on a person's knowledge under the particular circumstances. Citibank, N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1090 (9th Cir.1996). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id. (quoting Field v. Mans, 516 U.S. 59, 70 (1995) (quoting the Restatement (Second) of Torts § 545A cmt.b (1976)). "[A] person is justified in relying on a representation of fact although he might have ascertained the falsity of the representation had he made an investigation." Id. (quoting Mans, 516 U.S. at 70). However, a person cannot justifiably rely on a representation if he or she knows it is false or its falsity is obvious. Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh), 973 F.2d 1454, 1459 (9th Cir.1992) (a "person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth").

Finally, causation or proximate cause entails (1) causation in fact, which requires a defendant's misrepresentations to be a substantial factor in determining the course of conduct that results in loss and (2) legal causation, which requires a creditor's loss to "reasonably be expected to result from the reliance." Beneficial Cal., Inc. v. Brown (In re Brown), 217 B.R. 857, 862 (Bankr.S.D.Cal.1998) (citing Restatement (Second) of Torts, §§ 546, 548A). "A fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." Restatement (Second) of Torts, § 548A.

As discussed below, the Court finds that Defendant engaged in fraud in the inducement in luring Plaintiffs to invest in the Organics LLC and CFI's joint venture under § 523(a)(2)(A).

### (1)  FAILURE TO DISCLOSE MOUSSEAU WAS A CONVICTED FELON

#### i.  *Misrepresentations and Omissions of Fact*

There was no dispute that Geoff Mousseau is a convicted felon. He was tried in federal court, found guilty by a jury and convicted of conspiracy, two counts of concealing a total of $500,000 in assets in a bankruptcy proceeding, one count of aiding and abetting the making of a false declaration in a bankruptcy proceeding, one count of perjury in a deposition in a bankruptcy proceeding and one count of willfully withholding books and records in a bankruptcy proceeding. Roberts admitted in the pretrial conference statement that he knew of Mousseau's felony conviction and that disclosure of such conviction to investors was legally required. See Adv. ECF no. 47, at ¶8.

There was no dispute that Mousseau's felony conviction was not disclosed in writing at any time prior to Barnes' last investment. Mousseau's name is not mentioned in any of the initial offering materials provided to Roberts in October 2009. See Tr. Ex 71, 72, 76 and 78. Roberts testified that Mousseau was not mentioned in the initial offerings because he wasn't on board with the venture at the time. Mousseau, however, was included in the Limited Liability Agreement as Chief Executive Manager dated September 7, 2009, prior to the solicitation of Plaintiffs. See Tr. Ex 131.

Initially, Roberts testified that no documents were sent to Barnes disclosing that Mousseau was a convicted felon, but then said maybe that was not correct. Roberts then testified that Mousseau gave Roberts a stack of documents that he had with him at his second meeting with Barnes. Roberts claims the information was somewhere in there but he did not know if Barnes looked at it. Roberts had a duty to disclose to Plaintiffs Mousseau's felony conviction; handing Barnes a stack of documents and not knowing if he reviewed them, does not constitute disclosure. There were no documents submitted into evidence dated in 2009 that disclosed Mousseau's conviction.

When Roberts was questioned whether he had any personal knowledge that Barnes knew Mousseau was a felon, Roberts was certain that the second time they met in Barnes office in Santa Monica they discussed various aspects of the Venture and Roberts raised the issue about Mousseau and asked Barnes if he was comfortable with Mousseau managing CFI, but if not they needed to find someone. Barnes testified that it was not until after the Plaintiffs first $50,000 investment, but before the next tranche (the rest of the $379,000) that he even learned about Mousseau's role at Organics LLC through e-mails, in November of 2009, wherein Mousseau forwarded information Barnes had requested of Roberts. Barnes wrote to Roberts, on November 3, 2009, asking "Is Geoff supposed to be a manger of the LLC? He is listed as the chief manager." See Tr. Ex. 93-1. Barnes testified that Roberts told him that Mousseau was helping out with "back office" procedures, but did not disclose that Mousseau was a felon, or even an attorney, which could lead to discovery of the conviction through the California State bar website. Barnes testified that he had not heard Mousseau's name prior to receiving the email from him and only learned about Mousseau's felony through Martinez in approximately late May of 2010. Barnes was shocked at this nondisclosure, and then demanded internal financial statements and reports from outside accountants. These efforts were displayed through multiple emails beginning in late May of 2010. See, e.g., Tr. Ex. 36, 40, 141, 145.

There was evidence that in other circumstances Roberts and his colleagues suppressed information concerning Mousseau's conviction, even his status as a lawyer. Roberts and his colleagues endeavored to apply for their own PACA license, rather than continuing to use Manjar's license. The PACA application requires disclosure of a felony conviction of any insiders. Roberts and his venture partners failed to disclose Mousseau's felony conviction on the PACA application to the USDA, even though they used Mousseau's address on the application. See Tr. Ex. 116.

There was conflicting testimony concerning whether Mousseau's felony conviction was disclosed orally to Barnes prior to his investment. The testimony of Roberts and his witnesses were not corroborated by evidence and lacked credibility. Roberts argues that the only way this Court could conclude that Barnes was unaware in 2009 of Mousseau's felony conviction would be to conclude that Fantz, Mousseau, and Roberts all lied on the stand. Based on the evidence

presented at trial, none of the other testimony backed up Roberts' assertion that he or anyone else involved in the Venture orally disclosed Mousseau's felony conviction to Barnes prior to his investments. Fantz and Mousseau were not present when Roberts stated he disclosed the conviction to Barnes. Roberts, Fantz and Mousseau all concentrated their testimony on their belief that the Venture could have been successful had Martinez not undermined it and had someone funded further operations until they could get things rolling at Stater Bros. None of them seemed overly concerned about whether full disclosure had been made to Barnes before his group invested.

### ii.    Debtor knew to be false

Roberts knew that Barnes was an experienced corporate attorney and would not invest in the Venture if Barnes was aware that Mousseau was the Chief Executive Manager of CFI and a convicted felon. Roberts knew of Mousseau's conviction, he knew he had a duty to disclose this information, and he knew that Barnes was not apprised of this material fact.

### iii.    Made with the intent to deceive Plaintiff

Roberts would have been motivated to suppress disclosure of Mousseau's conviction to Barnes because Roberts "need[ed] $500,000 available immediately." See Tr. Ex. 78-3. Instead of disclosing Mousseau's conviction, Roberts, who was eager to get the Venture funded from Barnes' money, omitted the information that would have imperiled delivery of Barnes' investments. Intent can be inferred because Roberts knew that disclosure of Mousseau's conviction for financial crimes was likely to chase away the investments to get the Venture rolling that would pay for his salary of up to $18,000 a month.

### iv.    Plaintiff justifiably relied on the misrepresentations

Barnes testified credibly, that for any investment there are two potential "show stoppers" - bankruptcy and felonies. Barnes testified that he had conducted investigations of Roberts, Fantz, Martinez, Manjar and CFI. In Barnes' investigation of Roberts, he verified that Roberts was a member of the California bar, ran a UCC, and possibly a background search. Barnes ran a routine background search on a database of Fantz. Barnes also investigated Martinez and looked at both Manjar and CFI. If Mousseau had been revealed to Barnes as the Chief Executive Manager early on, he would have investigated him as well and discovered that Mousseau was convicted for financial crimes, and in all likelihood would have refused to invest. Roberts did not even mention that Mousseau was a lawyer, which could have caused Barnes to look Mousseau up on the State Bar website and discover Mousseau's disbarment. Barnes justifiably relied on Roberts disclosure of the key players of the Venture, that did not include Mousseau. Barnes investigated all the disclosed parties and because he found no red flags initially, he invested in the Venture.

### v.    Plaintiff sustained damages as a result of the misrepresentations

Defendant's failure to disclose Mousseau's felony conviction was a substantial factor in determining the course of conduct that resulted in Plaintiffs' loss. But for Roberts' omission, Plaintiffs would not have invested in the Venture that ultimately failed. Had Barnes been given the full information that he was entitled to, Plaintiffs would not have lost their investment.

Suppressing Mousseau's conviction was a significant one of Roberts' misrepresentations that caused of Plaintiffs' injury. See Offering Materials damages discussion section (2)v infra.

Roberts silence and failure to disclose this material fact constitutes a false representation actionable under §523(a)(2)(A).

(2) OFFERING MATERIALS

### i.  *Misrepresentations and Omissions of Fact by Debtor*

In the Venture's offering materials, Roberts used questionable financial projections and material misrepresentations to solicit investments to fund the Venture. Although, Roberts may not have known they were false at the time of the initial solicitation to Barnes, he was amazingly reckless throughout as he did not investigate or question any of the information he was presenting. And as time progressed, Roberts knew that the Venture was failing to meet his initial expectations and still continued to solicit funds from Plaintiffs.

### a.  *Offering Brochure*

The offering brochure was replete with misrepresentations that CFI was an operating company, when in fact it was nothing more than Roberts' and Fantz' idea to sell gourmet organic salads. Roberts failed to include any risk disclosures in the offering materials. Among the numerous risks nowhere disclosed in the materials were that no one at CFI had any material or relevant experience, that they had no operational history with Martinez, and that Roberts had not inquired about Martinez's operations before the venture was formed.

Roberts solicited the Venture by claiming that "California Farms, Inc. is an independent marketing and sales distribution company specializing in 'direct-to-retail' sales of organic produce products." See Tr. Ex. 71-9. The offering brochure and other materials stated that the business projections would be fulfilled with farmed lettuce. The brochure claimed California Farms: was a "Direct Farm–to-Volume Retail Sales Model," See Tr. Ex. 71-2, 71-3, 71-4; 71-9; had "575 acres under cultivation," See Tr. Ex. 71-6; "will utilize farming operations and processing equipment" and "existing growing fields," See Tr. Ex. 71-9; "is not just a farm, but rather a high-volume organic produce processing and packaging operation," See Tr. Ex. 71-12. The offering brochure boasted about the Venture's experience when in fact it was just starting out. The brochure claimed "California Farms has an exemplary long-standing record of growing, processing, handling storing and shipping certified organic produce . . ." See Tr. Ex. 71-4. Roberts asserted that he had "locked in our sales opportunities with the Stater Bros. chain," See Tr. Ex. 72-1, and stated that, respecting Albertson's, the "western regional president" approved California Farms to "begin sales and delivery at our earliest availability." See Tr. Ex. 72-1. The Venture, however, was not shipping product to stores at the time of this brochure and only ever acquired a vendor ID from Stater Bros. In addition, there was no distinction with Manjar in all the representations on behalf of CFI made by Roberts of what the Venture would do and the income it would generate. There was no disclosure of how dependent the Venture was on Manjar and Martinez for its success.

All of the above representations were dramatic exaggerations and they were all endorsed and signed electronically by Roberts. See Tr. Ex. 71-9 to 71-12.

### b.  Financial Projections

With reckless disregard, Roberts boasted how Organics LLC could triple revenues, with negligible increase in costs, through redirecting delivery of self-grown lettuce from wholesalers to retailers. Roberts claimed, "we have now successfully established the mechanism to grow, harvest, process, sell and deliver to major market retailers at levels that we believe will be in excess of our own conservative projections." See Tr. Ex. 72.

Roberts did not verify or even seem to care whether the financial projections in the offering materials were based on any truth. The financials did not disclose or include the costs for purchased as opposed to own-grown produce. Roberts presented Projected Revenues and Manner of Return Estimates that did not disclose the price of buying outside produce. See Tr. Ex. 71-13. The financials did not disclose any costs to purchase additional land, which would have been needed if Roberts's sales projections were to have come to fruition. See Tr. Ex. 72. One of the financial spreadsheets Roberts used to solicit investments included a calculation for Earnings Before Interest, Tax, Depreciation and Amortization ("EBITDA"). When questioned about where the cost to purchase additional land was disclosed, Roberts couldn't point to it. He didn't see a category for land in the spreadsheet but suggested those figures were built in to something.  When asked if the Projections included costs to third party vendors, Roberts again assumed that they were built in somewhere, he guessed into the cost of goods sold.

None of the solicitation materials included any disclosure of management fees but withdrawals were used to pay Roberts and the Venture partners. When questioned about the Estimated Use Of Funds Analysis he presented in his solicitation materials (last page of offering), there were no "management draws" listed. Roberts testified he believed the management draws were calculated in the category for support staff.  In the 2009-2010 projected revenue spreadsheet, there was also no disclosure of management draws.

The financials Roberts used to solicit investments in the Venture lacked numerous and substantial disclosure. The income figures were fantasies based upon the false projection that the Venture had secured contracts for huge orders from retailers. The cost estimates presented in the offering materials did not have any relation to the figures supplied by Martinez's accountant for the Manjar farming operations and no apparent basis in reality. Roberts and Fantz had received detailed cost projections (Tr. Ex.  B), from Martinez, the only person with experience in farm economics. Neither Roberts nor his Venture partners could explain why the costs in their own financial projections not only varied wildly from Martinez's costs, but why they projected expenses lacked the seasonality inherent in farming operations. Roberts attempted to rationalize that he wouldn't expect the costs to be the same. Roberts did not explain what portion of Manjar's costs should have been reflected in Organics LLC's financials, and did not show what information grounded the projected costs in Tr. Ex. 72. None of the Defendant's witnesses were able to explain how either the income or cost figures in the financial projections were derived.

### c.  Follow up Communications

Even after the initial solicitation, Roberts made numerous misrepresentations to Barnes about the Venture. Roberts sent an email dated October 30, 2009, in response to Barnes follow-up questions after the initial solicitation presentation. See Tr. Ex 78. This follow-up email was

seeking clarification about the information contained in the offering materials. Roberts reiterated and explained in detail what was presented in the offering materials. The response included a reference to testing in Albertson's stores, despite the Venture not having a contract or agreement with them. The email boasted about how conservative the Venture's ramp up projections and capabilities were and its existing processing capacity.  When Roberts was questioned about the representations in this email he drafted and sent to Barnes, Roberts said he had obtained that information from Fantz and Martinez. Roberts admitted he wrote the answers based on what he was told but he made no inquiry about the factual basis for the representations.

Barnes testified that in January 2010, Roberts had a conference call with the investor group. Roberts updated the investor group with a report about the Venture's operations and projections and discussed the retail program.  Barnes stated that Roberts never disclosed that there was no produce being grown by Organics LLC; that it was still primarily selling 3 lb. packages; and the Venture had no obligation by stores to purchase goods. Roberts suppressed disclosure of the early problems and instead falsely portrayed the status of retail orders.

Roberts induced in excess of another $200,000 in investments on February 4, 2010, during an investor conference call, knowing that the initial retail orders were being fulfilled by orders from PACA creditors. Finally, Roberts induced the last $100,000 investment through an email dated March 24, 2010. See Tr. Ex. 118. In this follow up email to an earlier conversation, he represented to Barnes that the deals with Safeway/Vons, Ralph's and Albertson's were pending formal issuance of a vendor ID but they were all on board ("WHEN, not IF"). Roberts wrote, "…our position today has shown great progress consistent with our projections. . ." In addition, to the misrepresentations regarding the deals with Safeway/Vons, Ralph's and Albertson's, Roberts failed to disclose that the Venture was having problems with meeting its own deliveries. See Tr. Ex. 31 (Email sent two days prior on March 22, 2010 noting that CFI was purchasing cartons that had been ordered by Manjar some time ago).

### ii.   That Debtor knew to be false

Roberts knew that many of the statements about CFI and the Venture were false or were made recklessly. Roberts and Fantz mislead investors by claiming Manjar's and Martinez's experience as their own. The offering materials authored and promoted by Roberts were very misleading. Roberts made no effort to vet the offering materials for truth or accuracy. Roberts was reckless in soliciting investments from Barnes based upon statements that he had not investigated, that omitted material information and that he had no basis to believe to be true. Roberts solicited investments based upon income and expense projections that Roberts did not author or understand; no one took ownership of; and which appeared to have been made up. When Roberts was asked about any of the projections he used to solicit investments, he responded that he was not an accounting person and assumed that the management draws and purchases of needed produce was already built into the numbers somehow and somewhere. Roberts credibly testified that he didn't create any of the projections. Nevertheless, even if Roberts had believed the financial projections to be true, he knowingly or recklessly made false statements regarding the reliability of the estimates. Roberts was grossly reckless because there was no investigation to determine whether what he was selling was true or even possible. Roberts presented and sold his ideal vision of the Venture, and as time progressed, Roberts knew that CFI was in trouble well before the final investment tranches were paid, and did not disclose this information in pursuit of his own purpose to keep collecting Plaintiffs investment money.

Despite all the representations in their offering materials that CFI was and would be growing its own produce, Fantz and Roberts both testified that they were instead buying it from third party PACA growers from inception. Roberts said he knew that CFI would have to buy produce from other growers because Manjar had never grown some of the varieties of lettuce needed in the salad packs but he never disclosed this material fact when soliciting the investment from Plaintiffs. When Roberts was asked if he had made it clear that the operation did not have sufficient acres to service all the stores that he projected they would get, his response was that it was obvious that 400 acres would never be enough to service 5,000 stores. During cross-examination of Barnes, he conceded that in the "Estimated Use of Funds Analysis", the written documentation clearly stated the possible need to "acquire land lease[s], as required, to meet growing requirements to meet customer demands". See Tr. Ex. 71-14.  The above misrepresentations, however, were reckless because the materials were not clear that there was no way to meet anticipated demand.  Roberts also withheld disclosing the PACA orders because he knew that if he sought permission from Plaintiffs to undertake the purchasing from third party growers that Plaintiffs would have learned the true state of affairs of the Venture and would have exercised their remedies, which would have frustrated and prevented the additional funding the Venture was seeking.

In addition, Roberts never disclosed that the success of the Venture was dependent on Manjar and Martinez. Roberts heavily relied on Manjar and Martinez to do everything involved in the Venture and yet, he did not conduct the necessary due diligence required to seek out investments. Roberts took the information given to him from Martinez about Manjar, exaggerated it to make it sound good to solicit investments in the Venture that relied heavily on a third party, which was never properly disclosed. Roberts claimed he had no reason to suspect Martinez's representations were not accurate but he showed a reckless indifference to the truth.

### iii.    Made with the intent to deceive Plaintiff

Roberts made the representations, discussed in section (i) above, with the intent to deceive Barnes. Roberts admitted that he "had updated the business plan summary," See Tr. Ex. 72- 1, which repeated the representations that CFI was "an independent marketing and sales distribution company" with farming operations. See Tr. Ex.  72-3-5. Roberts' goal was to fund the Venture, even if he had to shade the truth to reach it.  Roberts' statements were designed to impress Barnes to get him to invest in the Venture. Roberts presented himself as the CEO to Barnes but during trial Roberts testified his role in the Venture was to obtain the initial financing and marketing. Scienter is demonstrated by Robert's evasive testimony during trial. Roberts' demeanor throughout the trial revealed his state of mind from the start. He was very knowledgeable about the Venture when it was to his benefit but when he was pressed for explanations as to why he made certain representations; he blamed everyone else in the Venture for the misrepresentations that were made to Barnes. Roberts testified that he relied on the information he was told and argued that he had no knowledge of the information he was conveying. During trial, Roberts repeatedly stated that he had no personal knowledge of any of the accounting issues, but he solicited investments based on numbers and projections provided to him by others. Willful ignorance is not an excuse. Gross recklessness by a debtor as to accuracy of his representations is sufficient to satisfy intent element of the "false pretenses, false representation or actual fraud" dischargeability exception. In re Bocchino, No. 14-4299, 2015 WL 4478124 (3d Cir. July 23, 2015).

The purpose of the misrepresentations was to create the impression that CFI was an established, experienced, and successful produce growing company. In theory, Roberts believed the Venture had a good plan, so it wasn't necessary to provide details indicating problems to investors. Roberts and the Venture partners were all desperate for the money and had a huge motivation to cover up any issues and inflate how well the sales were going to keep investment cash flow going. The Venture partners seemed to think it was such a great business plan that they were justified in the omissions and misrepresentations made. Roberts' beliefs that things would all work out and that the Venture would be successful are irrelevant as to his scienter at the time he made the misrepresentations. He knowingly made false statements in order to obtain Plaintiffs' investment. At a minimum, the misrepresentations were made with gross recklessness as to its truth and with the knowledge that it would induce the Plaintiffs to invest in the Venture. Roberts' recklessness is consistent with his intent to deceive Barnes, as he believed in the end that he could probably get away with any consequences of his fraudulent representations. Roberts' reckless disregard for the information he was representing to Barnes and his representations as a whole reveal an intent to deceive.

### iv.  *Plaintiff justifiably relied on the misrepresentations*

Here, Barnes' reliance was both reasonable and justifiable. Barnes is a sophisticated investor but he had no previous experience with investing in this type of venture. Barnes reasonably relied on representations made by the CEO of the Venture backed up with an offering brochure, summary of the business, and financial statements. Barnes investigated the areas of the business he was familiar with, whether there were any liens on the collateral, and the existence of the trademark. He also did research on Fantz and Roberts, the two individuals who presented the deal to him, and upon whom he relied. Barnes did his due diligence in investigating the key partners in the Venture and looked at Manjar and CFI prior to investing. Barnes was thorough in his investigation and follow-up questioning into the Venture prior to investing and did not act in an unusual or unreasonable manner.

Barnes testified that the offering that attracted him to the Venture was that it was an on-going concern; an existing company and not a startup; and it had specific goals that needed bridge financing to achieve. See Tr. Ex 71-2. In making his decision to invest, Barnes testified he relied on the projections, the business plan, and key promises from Roberts and Fantz. See Tr. Ex. 71-9, 71-11, and 71-12. In particular, Barnes relied on the representations from Roberts in response to follow up emails. See Tr. Ex. 76. Barnes testified he wanted to wait on investing any money until after the "beta test" (the three week test market with Stater Bros.), but Roberts convinced him that wouldn't work. See Tr. Ex. 78-3. Barnes relied on representations and believed that Manjar, with all of its experience, employees and equipment had merged with and was now CFI.

Barnes believed Roberts' answers because he was the CEO and an impressive guy; Roberts never said he was not familiar with the offering materials; he had answers off the top of his head; he had details and was in command and control; Roberts didn't call others for information; his credibility was a basis. Similar to Roberts's testimony at trial, he had an answer and explanation for every question and appeared very knowledgeable of the Venture and its processes, when it suited his interests. Having been induced by all of Roberts' representations and the impressive financial projections, Plaintiffs invested in the Venture. Roberts testified that

he was not aware of any trouble with the Venture until May 2010. Accordingly, Barnes could not have had any indication of any trouble with the Venture until May 2010, which was right after Plaintiffs completed all investment tranche payments.

### *v.*    *Plaintiff sustained damages as a result of the misrepresentations*

Proximate cause is a term of art, demanding sufficient connection between the injury and the conduct alleged. <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Plaintiffs' loss of its $825,000 investment in the Venture was actually and proximately caused by Roberts' misrepresentations. There is no serious question on the facts that Roberts failed to investigate the offering materials before soliciting investments or that Plaintiffs would not have invested in the Venture absent Roberts' grossly reckless misrepresentations. But for Roberts' misrepresentations, Plaintiffs would not have invested in the Venture and subsequently lost their investment when the Venture could longer pay the PACA creditors it was purchasing from. After Plaintiffs ultimately decided to invest, it was never disclosed that CFI was not growing its own produce to fulfill its orders; was a small unestablished entity; or that Mousseau was a felon. If Plaintiffs knew any of that, they wouldn't have invested in the Venture. Roberts argued that Plaintiffs' losses were alternatively caused by the misdeeds of Martinez that caused the Venture to fail, but it was Roberts' misrepresentations and omissions that caused Plaintiffs to continue investing in the Venture even after problems began arising. Therefore, proximate cause has been established.

### (3) INVESTMENT WAS SECURED BY PROPERTY/EQUIPMENT

### *i.*    *Misrepresentations and Omissions of Fact by Debtor*

Plaintiffs argued that Roberts also made misrepresentations about the value of equipment used as secured collateral for the investment. Barnes testified the value of equipment was important because investors need at least a $2 million dollar balance sheet to want to lend in California because it is a fast repayment source and makes it a fairly riskless investment. There was no evidence presented to show that the $3 million in personal property/equipment contributed to Manjar and Martinez was inaccurate at the time the information was presented to Barnes. The alleged fact that Barnes was unable to locate and reclaim all of the equipment two years later in his failed attempt to liquidate the assets for his investors' benefit is not evidence that the $3 million valuation in the brochure was inaccurate.

Thus, the representation made about the value of Manjar's equipment was not made with the intent to deceive Plaintiffs.

### B.    § 523(a)(4): Fraud or Defalcation Acting as a Fiduciary

Plaintiffs allege, while acting in their fiduciary capacities, Roberts and the Venture partners committed fraud, defalcation, embezzlement, conversion and larceny. Specifically, Plaintiffs argue Roberts should be held liable under section 523(a)(4) because Roberts and the Venture partners looted an insolvent company for excessive management draws and perks with Barnes's money, and also because such looting exacerbated the debt to PACA growers for which Barnes ultimately became personally liable.

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. §523(a)(4). For purposes of § 523(a)(4), the Ninth Circuit has adopted a narrow definition of "fiduciary." In re Honkanen, 446 B.R. 373, 378 (B.A.P. 9th Cir. 2011). A creditor seeking a relief under Section 523(a)(4) must establish three elements: (1) an express trust existed; (2) the debt was caused by fraud or defalcation; and (3) that the debtor was a fiduciary to the creditor at the time the debt was created. Nahman v. Jacks, 266 B.R. 728, 735 (B.A.P. 9th Cir. 2001). Generally, the elements of the express trust include: "(1) sufficient words to create a trust; (2) a definite subject; and (3) a certain and ascertained object or res." Lovell v. Stanifer, 236 B.R. 709, 714 (B.A.P. 9th Cir. 1999). However, "[i]n order for a fiduciary relationship to exist, the court must determine that the circumstances establish an express trust pursuant to state law." Jacks, 266 B.R. at 736. Under California law "[t]he five elements required to create an express trust are "(1) a competent trustor, (2) trust intent, (3) trust property, (4) trust purpose, and (5) a beneficiary." Keitel v. Heubel, 103 Cal.App. 4th 324, 337 (Cal.Ct.App.2002). Intent is a question of fact. See, e.g., Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466 (9th Cir.1996).

Despite the forgoing, the phrase "while acting in a fiduciary capacity" in section §523(a)(4) does not qualify the terms "embezzlement" or "larceny." In re Littleton, 942 F.2d 551, 555 (9th Cir. 1991). Therefore, the elements of embezzlement or larceny must be satisfied, to find sufficient grounds for nondischargeability under §523(a)(4). "Under federal law, embezzlement in the context of nondischargeability requires three elements: '(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud.'" Id. (citations omitted). Larceny is the fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to the taker's use without the consent of the owner. Lucero v. Montes, 177 B.R. 325, 331 (Bankr. C.D. Cal. 1994).

(1) FRAUD OR DEFALCATION WHILE ACTING IN A FIDUCIARY CAPACITY

Plaintiffs argued that besides the obligations of loyalty, good faith, and fair dealing, Roberts is also held to a standard of a trustee. Under the Fifth Amended and Restated Operating Agreement Roberts owed various specific duties to Plaintiffs including authority as a "class B manager." Plaintiffs claim Roberts entered into agreements to violate the Operating Agreement of Organics LLC, specifically to engage in ultra vires acts by incurring indebtedness and liability with and to various produce growers, whereby various growers would provide product to Organics LLC, but conceal such sales from Plaintiffs. Plaintiffs maintain that Roberts owed them a fiduciary duty because the insiders of an insolvent company owe fiduciary obligations to its creditors. See In re Jacks, 266 B.R. 728, 737 (9th Cir. B.A.P. 2001). Moreover, Plaintiffs argue the fiduciary duty was created when Roberts and his co-ventures' purchased the produce from PACA growers and became trustees under PACA over the receipts therefrom after the investment occurred.

In this case, however, Roberts was not acting in a fiduciary capacity. Plaintiffs did not submit any evidence of value or present any evidence that CFI, Organics LLC, or the Venture was insolvent from day one as Plaintiffs contend, or at the various times Roberts solicited investments from the Plaintiffs. There may be some circumstantial evidence based on various

financial reports that came in as exhibits for other purposes, but no witness testified about insolvency. Presumably, the Venture was insolvent after the investment payments were depleted, but Plaintiffs failed to meet their burden of proof that the Venture was insolvent.

In addition, there was no fiduciary duty because the fiduciary relationship must have been created before the act of wrongdoing.  Ragsdale v. Haller, 780 F.2d 794, 796 (9th Cir. 1986). For a debt to be held nondischargeable under § 523(a)(4)'s defalcation provision, the debtor must have been a fiduciary prior to his commission of the fraud or defalcation. Bos v. Bd. of Trustees, No. 13-15604, 2015 WL 4568015, at *2 (9th Cir. July 30, 2015) citing Blyler v. Hemmeter (In re Hemmeter), 242 F.3d 1186, 1190 (9th Cir.2001). In other words, the act of wrongdoing that created the debt cannot be the same act that gives rise to the fiduciary relationship. Id.

Roberts induced Plaintiffs' investments in three phases: initially in late 2009, through emails and meetings, again in February, including a February 4, 2010 investor call, and through emails in late March. Thus, Roberts was not a fiduciary to Barnes at the time the debt was created in October 2009 through February 2010 when the debts to PACA creditors commenced. During March and April, Plaintiffs did invest a few additional tranches to the Venture but the PACA purchases did not create a fiduciary duty on Roberts to Plaintiffs. For a trust relationship under § 523(a)(4) to be established, the applicable [statute]  must clearly define fiduciary duties and identify trust property. The mere fact that [the statute] puts two parties in a fiduciary-like relationship does not necessarily mean it is a fiduciary relationship within 11 U.S.C. § 523(a)(4). See In re Honkanen, 446 B.R. 373, 379 (B.A.P. 9th Cir. 2011) citing Runnion v. Pedrazzini (In re Pedrazzini), 644 F.2d 756, 759 (9th Cir.1981). Although PACA is a valid statutory trust enforceable in bankruptcy proceedings, the trust PACA establishes is in favor of unpaid sellers of perishable agricultural commodities, not secured creditors. See In re Milton Poulos, Inc., 94 B.R. 648, 652 (Bankr. C.D. Cal. 1988) and 7 U.S.C.A. § 499e (West).  Plaintiffs failed to provide any case law to support that the PACA purchases created a trust between Roberts and Plaintiffs, who are not unpaid sellers of perishable agricultural commodities. The fraud in the inducement of the majority of investments was done before the PACA purchases were made.

## (2) EMBEZZLEMENT OR LARCENY

In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.

Here, there were no fraudulent appropriations of investment funds. The funds used to purchase produce from the PACA creditors was not misappropriated because it was used to fulfill the Venture's obligations to Stater Bros. and its customers. In addition, the unwarranted management draws were not misappropriated because Barnes was generally aware that the funds were being withdrawn, and although they were high, they were not forbidden. See Tr. Ex. 118 (March 2010 email about Management withdrawals) and Ex. 131 (Operating Agreements). Roberts, Martinez, and Fantz were authorized to take management draws. Finally there was no evidence that Roberts was entrusted with those funds, issued those checks, or was responsible for those withdrawals. Thus, there was no larceny or embezzlement under § 523(a)(4).

### C. § 523(a)(6): Willful and Malicious Injury

Section 523(a)(6) excepts from discharge any debt of the debtor "for willful or malicious injury to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Both willfulness and maliciousness must be proven in order to apply § 523(a)(6). Ormsby v. First Am. Title Co. of Nev. (In re Ormsby), 591 F.3d 1199, 1206 (9th Cir. 2010). "A 'willful' injury is a 'deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury.'" Barboza v. New Form, Inc. (In re Barboza), 545 F.3d 702, 706 (9th Cir. 2008) (quoting Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998) (emphasis in original)). At a minimum, willful requires a "deliberate act with knowledge that the act is substantially certain to cause injury . . . ." Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1208 (9th Cir. 2001). In other words, a debtor's act is "willful" only if he or she actually intended to cause injury or actually believed that injury was substantially certain to occur. Carrillo v. Su (In re Su), 290 F.3d 1140, 1144-45 (9th Cir. 2002). Proving a "malicious" injury requires a showing that the debtor (1) committed a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) was done without just cause or excuse. Id. at 1146-47.

The statutory scheme set out in § 523(a) indicates that nondischargeability claims alleging fraud should be brought under § 523(a)(2)(A). See McCrary v. Barrack (In re Barrack), 201 B.R. 985, 990-91 (Bankr.S.D.Cal.1996) (finding that the more specific statute, § 523(a)(2)(A), controls fraud nondischargeability rather than the more general statute, § 523(a)(6)), *reversed on other grounds*, 217 B.R. 598 (B.A.P. 9th Cir. 1998). The Supreme Court, has suggested that nondischargeability claims based on fraud fall within the ambit of § 523(a)(6) only if: (1) the debtor fraudulently obtained something other than money, property, or services; or (2) the fraud claim involved punitive damages. Grogan v. Garner, 498 U.S. 279, 282 n. 2 (1991). The Supreme Court has since clarified that all damages (both actual and punitive) resulting from a debtor's fraud are nondischargeable under § 523(a)(2)(A). See Cohen v. De La Cruz, 523 U.S. 213 (1998).

Here, Roberts did not willfully destroy the collateral securing repayment of the Plaintiffs' investment by running up debts to PACA creditors. There was no evidence that Roberts procured the PACA debt or participated in a scheme to thrust Barnes as the only identified individual potentially personally liable for such debt. The Venture partners, including Roberts, were just ignorant of the PACA issues until it was too late. It appeared that Martinez was the one who orchestrated the demise of the Venture without a plan or knowledge of Roberts. Although, the group's ignorance caused an injury, there was no intentional wrongful act done without just cause or excuse. Thus, Roberts did not have the intent or motive to inflict injury and the willfulness requirement under §523(a)(6) is not met. Consequently, there is no basis to award punitive damages.

Thus, the Plaintiffs claims for nondischargeability properly fall solely under § 523(a)(2)(A).

## IV.    CONCLUSION

Plaintiffs' claim is not excepted from discharge under 11 U.S.C § 523(a)(2)(A). Plaintiffs did not meet their burden of proof as to §§ 523(a)(4) and (a)(6). Plaintiffs shall submit an order and judgment consistent with this ruling.

### ###

Date: September 9, 2015

Maureen A. Tighe
United States Bankruptcy Judge